Thank you. Good morning, Your Honors. I'm Justin Augustine on behalf of Appellants Los Padres Forestwatch et al. And I would like to please reserve three minutes for rebuttal. We have four issues to discuss today, and I will start first with the Roadless Rural Conservation Act, on which we have two claims under that. So as you know, this case is about the Decoyah Project, and the majority of this project will occur on the Antimony Inventory Roadless Area, which is located in Southern California on the Los Padres National Forest. And it contains high-elevation forests that are going to be logged. And importantly, these forests are rare in this region and have been documented as such. That has nothing to do with what we're addressing today. I mean, it may be rare. It may not be rare. There's nothing in – it's not like there's an ESA issue or any other issue. The question is, does this comply – as you're phrasing it, does this comply with the roadless rule? That's correct. It's just an important fact as a backdrop to why we're here and why we care. Twenty years ago, the roadless rule was created to protect areas that are like the antimony from logging. And to that end, the roadless rule specifically states that logging must be rare, and it must meet three core legal requirements. The first one I'm going to talk about – Wait, wait, wait, wait, wait. This isn't logging, right? I thought we were dealing with the same issue, timber stand improvement and thinning. Correct, Your Honor. From my perspective, commercial thinning is also referred to as logging. Well, I mean, that's an interesting question. That sort of came up in the prior argument, and we didn't drill down on that. But it seems like there's a pretty significant difference. I mean, ultimately, what we're looking at is, does this fall within CE6? And if it falls within CE6, it really doesn't matter what you call it. I mean, ultimately, it fits the definition of a timber stand improvement, right? Well, let me – since we're talking about CE6 now, I'll go to that for a moment. I'm sorry. I didn't mean to take you off of the roadless rule. I actually am interested in hearing about the roadless rule. I'm just pushing back on this idea that this is – I mean, I don't think it's helpful to call it a logging project because you're trying to bring in a lot of extraneous issues. We'd be dealing with the same issue on roadless, whether it was a logging project or whether it was CE6, it seems to me. I agree, Your Honor, that it's just semantics and it's not important for – Okay. Then let's move on. – the resolution of this case. So, yes, thank you. I will go back – going back to the requirement under the roadless rule. The first one is that all logging must focus on what is called generally small-diameter timber. And the Forest Service here has violated that aspect of the roadless rule because nowhere in the record does the Forest Service explain why logging trees up to 21 inches in diameter will ensure that only generally small-diameter trees are cut. And that violates a basic tenet of administrative law, which is this court cannot defer to avoid. And broadly speaking, all that Forest Watch is asking for with this claim is the accountability that the standard of review under the Administrative Procedure Act demands, that there be a rational connection between the facts found and the choice made. And specifically what happened here, Your Honors, is all we have from the Forest Service is, quote, that they conducted exams and walkthroughs in the project area. So that's the entirety of what we have at point A. And then from that, they immediately jumped to point B, concluding that they can log up to 21 inches and still call it generally small-diameter timber. Well, let's talk for just a moment about the differences or lack of differences between the Frayser project and this project, because I think that's relevant to what you're talking about now. If you disagree, tell me. But I think your point is, well, I don't want to make the point. You believe there is absolutely nothing in the record, if I'm not mistaken, that substantiates the 21-inch figure. Am I right on that? That is correct, Your Honor. Okay. So let's go to the next step. The figure was different in the Frayser project, which I think it was then 10 inches. Is that right, rather than 21 inches? Correct. They only decided to log up to 10 inches in the Frayser Mountain project, which is close by to this Tequoia project. Is there anything in this record, one way or the other, about what differentiates these two projects? They're right next to each other. I think Judge Nelson raised this earlier in the other case. From your standpoint, what's the difference in the topography, the types of trees, if any, between Frayser project and the adjoining Tequoia project? Thank you, Your Honor. As far as I'm aware, they are extremely similar in that these are, A, very close by, within the same ranger district, within the same national forest, and they have the same types of trees, such as Jeffrey Pine. Sorry, I'm forgetting the name right there. And while they may not be 100% exactly the same, I want you to keep in mind why we presented the Frayser Mountain data. We aren't saying Frayser Mountain is the answer for Tequoia. We are saying because the Forest Service gave us nothing to look to for Tequoia, we're going to show you, the court, an example of what they might have done to get at the answer correctly. And in that instance, not only did they use the right process, they got a very different answer, 10 inches. And let me take a step back. When I say they used the right process, I'm referring to the information that appellants submitted in the further excerpts of record with our reply brief, wherein the Forest Service and the Frayser Mountain Project presents the exact kind of data that the road list rule calls for, namely stand diameter distribution data. And they present narrative as well as graphs there, explaining how they examined the stands in question that they were going to log. And they used that information to then conclude that 10 inches was appropriate for achieving the same types of goals the Forest Service has in mind for Tequoia, namely hazardous fuels and stand density. So these projects- Is there a commonly accepted understanding of the terms exams or walkthrough in this context? Is there a particular methodology in this area that people understand what that would entail? The short answer is I don't know. The way I understand it, Your Honor, is that it means they went into these stands and collected data, perhaps just like they did in Frayser Mountain at step one. But the difference between here in Tequoia and Frayser Mountain is they never got to step two or three. They never took that stand exam data and presented it. So we have nowhere in the record from the Forest Service in this case where they took what they looked at in that stand exam data and presented it to us or the court and explained what methodology they used to analyze it to then arrive at the conclusion that 21 inches was appropriate. And in your view, what the agency did in Frayser, is that the minimum they have to do or is that just an example of what would be sufficient to withstand our review here? Well, it's a good question. It's interesting, Your Honor, because, and I will directly answer you, but I want to make a quick point. In the Frayser Mountain project, the roadless rule wasn't actually at issue, but they still did this process. I believe that process, while it may not be required generally under NEPA, is absolutely required for the roadless rule because that's what the roadless rule asks the Forest Service to do when it's trying to determine generally small diameter. It asks it to look at stand characteristics. That's at 2-ER-205. And I'd like to read one specific statement from 2-ER-205 from the rulemaking that I think really gets at your question, Your Honor. And it says, quote, all such determinations of what constitutes generally small diameter will consider how the cutting or removal of various size classes of trees would affect the potential for development of the stand. And to me, that's the exact thing they did in Frayser Mountain. They took various size classes, presented it in graphs, and then used that to arrive at a conclusion. It's possible all that might exist for the Takoya project somewhere, but they've never presented it anywhere here. And so, again, it's about accountability under the Administrative Procedure Act. If they want to get from point A to point B, they need to explain what happened in between before this court can defer to them. And just one extra thought on that is, to me, it reminds me of fifth-grade math class where my teacher told me, if you want credit for the right answer, you have to show me how you got that answer. And that's really what's happened here. You've got to show your work if you want to get credit for it. Can I ask a question? If we were to agree with you on the roadless rule argument, I think we'd have to just remand it. Or could we allow the 34% of the project that's not in the roadless rule to go forward pending a remand? It's a good question, Your Honor. Frankly, I haven't deeply thought about that. My inclination is to say no, that the whole project needs to be vacated and they need to consider it as a whole. But I would have to look at that more closely as to what the law specifically allows in a situation like that. But that also gets at, from our perspective, and I'll get to this in a little bit, just like we discussed or you discussed in the previous case, we think the entire project is in violation of CE6. But before we jump to CE6, let me see here. Under the roadless rule, there's one other requirement they violated. They're supposed to explain how they will maintain or improve one or more of the roadless area's characteristics. It's very clear here that they never actually identified a characteristic and therefore never explained how they were going to maintain or improve it. So this is a clear-cut situation where there is nothing to defer to because we were never given a reason to critique in the first place. And I think the Fraser Mountain project highlights this issue as well. That project shows that if fire is really the issue, you can do it in multiple ways. You don't actually have to cut up to 21 inches to maintain or improve from a fire perspective. And their own fire report in this case, 2-ER-53-63, nowhere says that they need to log up to 21 inches to address fire issues and therefore provide any benefits. So even under the reasons these guys gave, the Forest Service, excuse me, gave as a post hoc rationalization, which is illegal itself, even the reasons they gave post hoc don't satisfy the arbitrary and depreciate standard. And moving on to CE-6, Your Honor, like the appellants before us, we believe that the regulation cannot be interpreted to include a commercial thing. And I want to jump to something. I want to ask about that, and we sort of got into this in the prior argument, but what is it about the text of the regulation that leads you to that conclusion? Because the Forest Service manual definitely talks about pre-commercial thinning, but the rule itself doesn't say that. It just says thinning. And so why isn't thinning broad enough to encompass both commercial and pre-commercial thinning? Thank you, Your Honor. Two parts to that, two answers to that question, I guess. First, the overarching mandate of CE-6 is timber stand improvement. So from our perspective, all examples have to fit within that. And the second part of my answer is that in our reply brief, we point to a very recent post-Kaiser Ninth Circuit case that had a very similar situation in the sense that there the court said, this is at ESV Crandall, and it discussed how examples in a regulation should not be misconstrued by being read in isolation and thereby making a narrow, what is otherwise a narrow regulation, read too broadly. Well, I'm not sure those apply at all. I mean, there's no inconsistency in the regulation. And I mean, so one argument is we shouldn't even be considering the Forest Service manual. We don't know anything about it. We don't know who put that in there. We don't know how it was developed. What we do know is it didn't go through notice and comment. We don't even know whether those are commonly accepted definitions that could actually inform the definition of thinning for purposes of the CFR adoption. If we do go that route, what we do know is that the Forest Service manual suggests only pre-commercial thinning is appropriate. And pre-commercial was not included in the regulation. In fact, it was in the draft regulation, but not the final regulation. So it does suggest that thinning is broader. I don't know how we can reach any other conclusion than that thinning is broader than just pre-commercial thinning. I mean, I think that just has to be there. So if we accept that, how do you win under that theory? I'm not sure I'm understanding the question correctly, but let me put it this way. Well, the question is this. They issue a regulation. You agree that the draft regulation that led to CE-6 said only pre-commercial thinning would be allowed, right? Correct, Your Honor. The final regulation takes out pre-commercial thinning. Shouldn't we draw some inference from that? If we read this in isolation, the answer to your question might be yes. In isolation, what do you mean? Are you saying considering the Forest Service manual, or are you saying isolation, considering other parts of the regulation? Considering what happened between 1991 and 1992, as we discussed in our briefs, not only did pre-commercial get dropped between 1991 and 1992, the term timber stand improvement was added in 1992 to address the term in 1991 that just referenced, quote, silvicultural practices. So it's really important to understand that 1992 chose, the final rulemaking in 1992 chose the term timber stand improvement. To me, that's a very big deal, and it shows that it was a particular term that's meant to encompass what silvicultural practices are allowed under CE-6. Right, but where in the regulation does it define timber stand improvement in a way that would not permit this project to fall within CE-6? Well, that's one of the essences of this case in terms of what does Kaiser instruct. From our perspective, it allows this court... I know, but I just want to be clear. I'm sorry. Your arguments are almost solely based on the Forest Service Manual as to why timber stand improvement should be defined different, or, excuse me, why timber stand improvement should be defined in a way that precludes this project from being encompassed under CE-6. No, Your Honor, there are two very important facts separate from the term. Okay, let's hear them. Specifically, in 1992, when the CE was finalized, the part of the CE of the overarching rulemaking that spoke explicitly to commercial thinning limited it to 200,000 board feet. And even that limitation was challenged facially in a court and struck down by the Hartwood Court, cited in our briefs, because it was too much thinning to be justified based on the record before that court. So we already have a court telling the Forest Service 200,000 board feet limitation is too much for commercial thinning, and yet here they want you to turn around and say, oh, yeah, it's okay to do unlimited commercial thinning, even though the exact same rule... Hold on. It's not unlimited. We've heard in the prior case there's the one-mile road limitation. There's the extraordinary... Okay, go ahead. You got excited. I want to hear what you have to say. Those are not actually limitations. Thank you for reminding me. The 1992 commercial thinning CE, it specifically states that, and I'm talking about the 200,000 board feet, that, too, had a road limitation on it, one mile or less. So it's actually not different than CE-6 when it comes to roads. Same thing with herbicides. In the 1992 commercial thinning findings, they didn't... I just want to be clear. The 200,000 board feet, which was struck down, was that part of CE-6 at one point? That's what you're saying that was part of CE-6 in 1992? No. To clarify, Your Honor, it was part of the same rulemaking. So you have an overarching regulation that has multiple parts, one of which is CE-6. This was part four, and it was invalidated, so it no longer exists. So I don't call it CE-4. It just doesn't exist anymore. But when that limited 200,000 board feet CE was struck down, the Forest Service in 2003 came back and made some very clear statements about how they believed in 2003 that they no longer had a CE to do the exact same things that they want to do in the Tequoia Project, like address insects and disease, address forest health. And so that's why they created in 2003 the CE-12 that only allows up to 70 acres. And I would like to point out that that CE as well has a road limitation. And so it's no different than the CE-6. Okay. I think we're running your time here. I wonder if we shouldn't keep some of this for rebuttal. I think you've made your points, and we'll give you more than 30 seconds for rebuttal. Okay, thank you, Your Honor. Sorry. All right. No, don't apologize. It's helpful to us. We just got to kind of stay on track. Mr. Baylor, you're arguing first. Is that right? Yes, Your Honor. All right. Are you open to either question, or are you just addressing one of the two that we have here? No, I'm open to anything you'd like to ask, Your Honor. So let me just get to the point. Your clients didn't do a great job on complying with the roadless rule, in my opinion. They said 21 inches, and they didn't say anything more. Help us understand how this complies with the small diameter timber requirement for the roadless rule. Sure, Your Honor. So the decision memo itself recognizes that a portion of this project, about 1,100 acres, is scattered throughout an inventoried roadless area. The forest supervisor recognized that thinning is supposed to be infrequent and rare in a roadless area, and then prepared a decision, like a memorandum, that was submitted to the regional forester. The memorandum, I believe, is we say in our brief, I don't have this citation in my fingertips, but that memorandum lays out to the regional forester why this project complies with the roadless rule. Can we find that? Because that, I think, might provide what may be missing. 2ER156 to 2ER157, I believe that's the memorandum that the forest supervisor prepared and submitted to the deputy regional forester. The decision memo itself refers to the review process by the deputy regional forester. Okay, so let's go to that. I've got 2ER156 in front of me. The second paragraph says, the proposed Sequoia Ridge shaded fuel break project includes mechanical thinning of trees less than 21 inches DBH. Okay, but does it ever say why that is a small diameter number? I mean, let me tell you my concern. If EPA were setting a threshold for how much pollutant could be put into the air and the regulations said you can only release a small amount of this pollutant and EPA came back and said, well, 100, whatever the measurement would be, is small, I think we'd all be scratching our heads and saying, well, how did you get there? Well, don't worry, we've got scientists. They got this covered. And we'd say, no, that's not good enough. So help me understand why we can do that here with a 21 inch and say, they said it was 21. They had some guys who walked through, that's good enough. It is good enough, your honor. And what happened here was the Forest Service, this project was identified in the wildfire protection plan that the local community in coordination with the Forest Service, they're looking to find priority projects that are going to treat areas of the forest that are at high risk, that are overcrowding. Now this is in the record. There are 480 trees per acre. It is very dense. The overlapping crowns of these trees, they act as a fuel ladder. What that means is the reason why you're removing 21 inches or less is because those are the sorts of trees that are overcrowding the larger trees. If you look at the rulemaking record, which both sides cite to this, it talks about the roadless rule. The roadless rule was designed specifically by the Forest Service not to have a definition. The Forest Service rejected a one size fits all approach to the size of tree that is to be considered generally small diameter. Why did it do that? Because it depends on local ecological conditions. Those conditions necessarily vary from project to project within different areas of the forest, within different stands. Here what you have is, and the Forest Service looked at its forest plan, the forest plan defines larger trees as those greater than 24 inches. Consistent with guidance in the forest plan that says, retain stands with larger trees, 24 inches and above. Those are exactly the sorts of trees that are going to stay here. All of the larger trees greater than 24 inches will be retained within this area. Hold on, let me back up. The 24 inches comes from the forest plan and it says larger trees in this forest are defined as 24 inches and above. That's correct, your honor. There is no definition for smaller, there's no definition for medium. And the roadless rule itself, both in the text of the regulation, as well as the rule making record, makes clear that these are supposed to be based on local ecological conditions. I agree with all that. I don't disagree. I'm certainly not suggesting that you have to go to 10 inches that was done in Fraser. I agree. But it's a little bit troubling. You've softened it a little bit by saying there was something in the record, but it's just troubling when there's a requirement to meet a standard in an agency that says this is what we're determining. There's really not a lot of flesh out. But if the forest plan says that, that's helpful, I think. And the Forest Service recognized that. That's in the record. They specifically cited this standard. Let me put a fine point on it. What did the Forest Service do that's in the record to come up with the definition of trees less than 21 inches DBH? In the decision memo itself, Your Honor, you can walk through, you can start at the first page. It talks about the need for treating this particular area of forest. It talks about the existing condition. The fact that you have these overlapping crowns, the fact that you have overcrowding, which causes significant damage by insects, disease, and wildfire. The Forest Service wants to protect this local area. The reason why it wants to protect this local area, because the local community itself, for several years, has asked the Forest Service, has identified this as a priority treatment area. In selecting the size of trees that need to be removed, the Forest Service properly relied on local ecological conditions that it assessed through walkthroughs and exams. It lays out what it wants to do. It wants to return this area. This is from the text of the Robust Rule, the historic tree density that existed before this overcrowding had occurred. That means that it wants to retain larger trees, that it wants to create stands that are resilient to insects, disease, and fire. That is why it's removing 21 inches or less. It is removing brush. It is removing all the sorts of things that create these ladder fuels that will ignite the larger trees. We may be asking too much. I recognize that. But again, I think what you're telling me is, in this two-page 156-157, the determination that mechanical thinning of trees less than 21 inches, with the emphasis on 21 inches, was arrived at by walkthroughs. And there was something else. That is not the only thing that I'm relying on, Your Honor. I'm relying on the decision memo itself, which is 2 ER 22-43. In addition to that memorandum that lays out... Doesn't that just... Hold on. The decision memo, doesn't that just repeat the same thing? I mean, trees would be removed throughout all diameter classes and would include removal of commercial trees. Then it goes on and says, a part of the project is within the IRA, consistent with the 2001 Roadless Rule, generally only smaller trees, 21 inches diameter, breast height or less. Here's the issue. Everything you said today in argument makes sense. I think this would be an easy thing, presumably, for them to do. I just don't see it in the document. Nowhere in the Roadless Rule... Your Honor, nowhere in the Roadless Rule does it say that the Forest Service must prepare stand density data. It doesn't say that. And Vermont Yankee tells you that you're not allowed to engraft on some sort of procedural requirement based on some notion of public good. That's not how it works. The Forest Service properly identified... Oh, but this is reviewed under the APA, right? This is reviewed under the APA. There's nothing arbitrary and capricious about the Forest Service's decision, Your Honor. They properly relied on local ecological conditions. They walked through the existing conditions, why this overcrowding is such a problem, why it's a threat to local communities. There's almost 4,000 houses surrounding this project area. No, I agree with all of that. I agree with all of that, but I don't see anything in there other than the 24 inches is apparently defined as large under the Forest Service plan. That may be the best out. But the rest of this, it doesn't say why they picked 21. Why didn't they pick 10? Why didn't they pick... Presumably, they could have gone above 24. Are you saying that would have been the outer limit? No, it does. We cited this in our brief. They specifically said the reason why they picked the 21 inches or less is because that is how you accomplish the goals of this project. By removing 21 inches or less, that is how you best protect this area of the forest from catastrophic wildfires. It seems to me... Let me ask a question. Did the Forest Service undertake measurements of the DBH, the average, median, it doesn't matter, of the DBH within the Taekuya Ridge project? Was that undertaken or is it simply a walkthrough? Let me phrase it more pointedly. Did they measure the DBH in this area? Yes or no? If you know. Your Honor, exams and walkthrough, I think, means exactly. When a silvicultural specialist is going out into the forest, you defer to the scientific expertise of the Forest Service. To my knowledge, the Forest Service did exactly what it was required to do. It looked at this particular stand, designed this project to accomplish ecological objectives, and it explained exactly why it picked this size of tree to accomplish those objectives. A different size tree would not accomplish the objectives. I have your answer. Thank you. Judge Lee, I'm sorry. I want to touch on this Fraser Mountain project, Your Honor. That project was 3,000 acres. It also involved thinning over, I think, it was like 1,700 acres. It involved road construction. It has no bearing on the outcome here. There's no reason, there's no requirement for the Forest Service to explain why it relied on an environmental assessment in that project, and it didn't here. To answer your question about what's happened since the 1990s, more recently, and we cite this, the Healthy Forest Restoration Act in 2003, Congress recognized that insects, fire, and disease are killing our forests. You've had many forest fires in the last year, the largest ever in the history of California. The Forest Service is taking action specifically to address that threat, and it's not doing so on its own. It's doing so because the local community is adhering to the act of Congress and coming and working with the Forest Service to identify areas that need treatment. This is one of those areas. It was number two on the priority list for good reason. Is there something in the agency that defines what's required for exams or walk-throughs? Because otherwise, if there isn't, it seems like the agency is relying on these magic words that they conducted exams and walk-throughs and don't have to provide any underlying information. Again, I don't think you have to provide opiate amounts of data, but at least something for us to look at. Otherwise, the fact that we read that in the decision memo that there were exams and walk-throughs, it really doesn't tell us much. Your Honor, the Forest Service is entitled to presumption of regularity. There's no suggestion here that they cut corners or that somehow the Forest Service has misrepresented what it did. It went out and walked this area. It chose these trees specifically so that it can increase resilience to fire, insects, and disease. And if it weren't removing this size trees, it would not be accomplishing project objectives here. I know we're cutting into time, but I have two questions. Number one, if they had said it was a 26-inch diameter, would that have been arbitrary and capricious given the Forest Service plan? In the rulemaking record, my opposing counsel just cited this. It specifically does refer to ecological conditions guided by land management plans. So in this particular instance, the land management plan, the forest plan, talks about 24 inches. We would have a serious problem if we were trying to remove trees that were larger than what the forest plan allows. So I think in that situation, it would be very different. Here, that's not what we have. We're removing 21 inches or less. They are generally smaller in diameter. That's helpful. And then the second one is the question I asked. If we disagree with you, could we allow a limited remand and allow 36% of the project to go forward that's outside the road? That just doesn't make sense practically. As a practical matter, Your Honor, the Forest Service is currently proceeding with aspects of this project. It's in the process of awarding a service contract, meaning that the Forest Service is actually paying contractors to go out and remove these trees. It has not yet awarded a single timber sale, and it's unclear whether the Forest Service actually will do so. So I don't know what a remand would look like. On this record, there's no need for you to do that. You should affirm the judgment because the Forest Service actually did explain why it chose this size diameter tree, and it recognized the roadless rule and complied with it. Okay. Hey, thank you, Counsel. I appreciate your indulgence on our questions. Mr. I'm sorry, Fite? Yes, Your Honor. Can you all hear me okay? Yep. Go ahead. May it please the Court, Lawson Fite. I'm here on behalf of the interveners, which are American Forest Resource Council, California Forestry Association, and Associated California Loggers. I want to emphasize this is a project about fire. It's not about timber. It's about restoring and maintaining a fuel break on the Los Padres National Forest that was prioritized to protect 3,800 structures. As Government Counsel just stated, it's unclear whether there will be any commercial timbers sold from the project, and as we noted in the record, as our declarants noted in the record, the involvement in this case by forest products businesses is not solely economic. It's about their interest in protecting forest health, their interest in getting work done on the forest that preserves the multiple uses that these forests can provide. And here you have a very vulnerable community, and you have evidence that fuel breaks like these work. They allow firefighting crews to get in. I appreciate this. I don't see that as an issue here. I don't sense that anybody's disagreeing that this needs to go forward. I mean, the question is, are we being too technical on... In my mind, one of the questions is, are we being too technical on what we're asking the Forest Service to do when they said 21 inches? They didn't give any of the explanation. They didn't even actually reference the, you know, that 24 inches was large, and therefore anything under that would be small diameter, and therefore we're choosing 21. I mean, what... The question is, was this done properly, or do we need to send it back for them to explain the rationale? Your Honor, I think to answer your question, and also Judge Stein, I think, was asking this, there is a little more in the record than has been discussed. I would point you to volume 2 of the excerpt, page 158. There's a briefing paper that goes with that regional memo, and the second bullet point there talks about... Yeah, no, I'm reading it. It says consistent with the... I mean, it's just a repeat of everything else we just talked about. Well, except for... Oh, you're right. It does say the management plan. That's a helpful addition. And then in the second bullet point, the final sentence says this diameter would be needed to be sent to meet the desired conditions of the proposed action to a 90% effective level, which is... That's the rationale. They need to go up to this size here and there to meet the fuel break maintenance objectives of the project. That ties in also to the fuels and fire report, which is... That starts at volume 2, page 53 of the excerpt of the record. There's a lot of detailed information about fire and fuels conditions and says these conditions support the project design. The project design is consistent with what we need to do here. So there's a lot going on here, but in our view, there's enough in the record to show that the Forest Service applied some judgment, and that's consistent with the language of the roadless rule. I think the language of both the regulations here, both the CE and the roadless rule, is really important. The roadless rule says generally small diameter timber, and they're operating in a very small portion of the roadless area, and they capped it at 21 inches. And if it said only small diameter timber versus generally small diameter timber, that implies there's going to be some exercise of judgment. That seems to be what's going on here. So under your interpretation, generally small diameter timber, theoretically you could have set an outer limit of 24, 25, or 26. I mean, presumably then you might need an analysis to say, look, it's not 100% that are going to be that large. Only 10% are going to be above 24. But 90% generally are going to be small diameter timber. I agree with government counsel that if you go above a limit in the forest plan, you're running into trouble. Well, then what does generally add? I mean, to me generally suggests in general they have to be 24 or less. You seem to be suggesting general gives them more leeway on how precise they have to be in explaining their decision. It gives them some leeway. And so the way that I would characterize it is that it doesn't – it's not a hard cap. It leaves some room there for the exercise of professional judgment, which is what the Forest Service deployed here. I wanted briefly to address the CE issues because there's – one of the questions that the court was struggling with is what's the limiting principle? I think the forest plan there is also a limiting principle. Every action taken on the national forest system has to be consistent with the forest plan. Well, yes and no. The problem with that is that's not a part of the CE-6 requirement. So that would be challenged separately. Yes, there may be other limitations. I mean, Endangered Species Act is also a limitation. Sure. So, I mean, I think what we're concerned about are limitations that are specific to CE-6. Kind of inherent limit – yeah, and that's a good point, Your Honor. One of those is qualitative more than quantitative. So that's – this is a qualitative CE. It's one that is specific. It aims at a specific type of treatment that can be rationalized in a specific way and designed in a specific way. So project design is a little different from intent or impact, but it really affects how the project is impacted. So it's a certain type of project that qualifies. It has to have these rationales that have to do with improving the state of the forest and similar things. It's a qualitative rather than an acreage limitation. Another limit that I think could give Your Honor some comfort, and if I might just address this briefly, is just the way that Congress has been acting with regard to the forest health crisis. There are now several statutory CEs up to 3,000 acres. And that guidance from Congress, that statutory history, is going to inform how regulatory CEs are implemented, and it should. So if – that is certainly a limiting principle. I think if the Forest Service were to try to go out and do something that's a completely different order of magnitude from anything that Congress has authorized, they would again have a problem. And my final point I just wanted to address is the Forest Service manual, how to deal with that. I think the court's inclination seems to be, well, we start with the regulation. What is the text of the regulation says? And it's quite clear. It says thinning. As Judge Lee noted, it mentions girdling, which girdling is you basically cut around the exterior of a tree. And that's usually – it creates a snag, which is a large – so it has to be pretty large. So there's no inherent age limitation there. And the way we look at the manual is the 1990 manual, which is identical to the 2004, can be helpful in interpreting the text. It's because the – when the regulation was moved into the CFR from the manual, that was the state of the manual. So that's kind of part of the history. Part of what the appellants are trying to do is impose a later issued manual provision, the 2014, on that. And that's simply not appropriate. Okay. I think we have the argument. We've given a fair bit of attention to C6. So thank you for your points on that. If I could just make one final point about the old manual and the pre-commercial thinning part of it, that the manuals – the part that the plain – or the appellants talk about pre-commercial thinning is not – if you read it in context, it's not dispositive, and it doesn't limit it to pre-commercial thinning. Okay. And there's several other – I think these arguments – we're just starting to rehash the brief. So thank you, though. You've been very helpful. Mr. Augustine, we'll give you two minutes for rebuttal. Okay. Thank you, Your Honors. I'm going to address a couple of important points on the road list role issues you've just been discussing. I'd be interested in hearing 158. I hadn't looked at it in that light, and it does talk about the Los Padres Land Management Plan, and it does talk about this diameter would be needed to be thin to meet the desired conditions to a 90% effective level. Admittedly, the explanation is a bit thin, but why is not enough? I'll get at both of those. So in our briefs, we addressed and acknowledged that 24 inches is in the forest plan for large trees, but that should not be determinative of equating with what is generally small diameter timber. The two just aren't the same. You'd be leaving out an entire category. I don't think they're the same. I mean, what we heard is if it's above 24, they've got a problem, and do they have leeway under that? Yes, we agree that they have leeway under the road list rule to define generally small diameter timber, but they have to do it at the project level, and they have to explain how they arrived at the decision. Well, but they do. Under this, they say the desired condition, it meets the desired conditions of the proposed action to a 90% effective level. Why isn't that enough? That's the exact same problem we discussed earlier. There are two problems there. First, it's a conclusory statement. Nowhere did they explain how they arrived. Right, but you want them to do what they did in Frayser, and that was consistent with an EA. No, that was consistent with what I think has to happen under the road list rule. They have to explain how they got from point A to point B, and desired conditions is not justified anywhere, and I would point you to their own fire report. So setting aside the Frayser document, in the own Sequoia fire report, 2-ER-53-63, nowhere in that document do they justify addressing fire by going up to 21 inches. When I read that document, they are actually saying they only need to address hazardous fuels up to 10 inches. If you look at 2-ER-57 and 2-ER-59, you will see that the fuels they identify are not 21 inch trees. They refer to, quote, this is table three. They refer to the timber understory, which is small tree understory, and otherwise they're referring to grasses and shrubs. And even when they refer to small tree understory, they limit it to 153 acres of the entire project. So there's a big difference between what they're actually saying in their fire report, the only document where they actually talk about fire and try to present findings, and the 21 inch. You will not find the word 21 inch in the fire report, and you will find nowhere in the record. Well, I don't know that that's the relevant issue. Okay, anyway, I think we have your argument on that. Was there another point you wanted to make? Well, I just think they're conflating desired conditions with generally small diameter. This rule exists for a very broad purpose of making sure that logging is limited to that, and you shouldn't be able to just say, well, we're meeting desired conditions, and that's good enough to qualify as generally small diameter. I'll leave it at that. Okay. Hey, thank you all. This is one of the more semi-complicated cases for a timber stand harvest, and we appreciate you and prior counsel elucidating us on that. The panel is going to take a short recess, five minutes before our final case for the day. Thank you. Thank you, Your Honor. This court stands in recess for five minutes.
judges: Stein, Nelson, Lee